IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.   14-cv-00246-LTB-MJW

ROBIN DILLON,

        Plaintiff,

v.

AUTO-OWNERS INSURANCE COMPANY,

        Defendant.

---

## ORDER

---

This matter is before me on Motion to Exclude Certain Opinion Testimony of Janet N. Lemmon, Ph.D, Pursuant to F.R.E. 702 and F.R.E. 403 filed by Defendant Auto-Owners Insurance, Inc. ("Auto-Owners")[**Doc #52**]. Plaintiff Robin Dillon opposes the motion. After consideration of the parties' briefs and attachments, as well as testimony from experts proffered by both parties at an evidentiary hearing on September 30 and October 1, 2015, and for the reason stated, I DENY the motion to exclude as follows.

## I.  BACKGROUND

On July 1, 2009, Plaintiff was stopped in traffic when she was rear-ended by a vehicle driven by Carlos Navarro. Mr. Navarro claims that he hit Plaintiff after making an abrupt lane change when another driver cut him off by pulling into his lane. After she settled her bodily injury claims with the other drivers, Plaintiff then made a claim – under the insurance policy issued by Defendant Auto-Owners on the car she was driving – for the limit of the policy's UIM coverage (in the amount of $500,000) on December 27, 2012. Auto-Owners conveyed a

compromise/settlement offer on July 31, 2013.  Plaintiff did not accept this offer.

Thereafter, on December 30, 2013, Plaintiff filed this action against Auto-Owners in Boulder County District Court and the case was subsequently removed to this Court based on diversity jurisdiction.  The claims raised by Plaintiff against Auto-Owners are for: 1) Breach of Insurance Contract; and 2) Statutory Bad Faith Breach in Violation of Colo. Rev. Stat. §10-3-1115 & §10-3-1116, based on "unreasonable delay and for lack of any reasonable basis for denying [Plaintiff's] claim."

Auto-Owners now files this motion seeking the exclusion of a portion of the expert opinion proffered by Plaintiff's neuropsychologist, Janet (Jan) Lemmon, Ph.D.  Plaintiff was referred to Dr. Lemmon two years after the accident.  At that time Dr. Lemmon administered neuropsychological and emotional functioning tests to Plaintiff in June of 2011.  Based on the results of that testing, Dr. Lemmon referred Plaintiff to a speech language pathologist for cognitive therapy and an optometrist for visual processing and eye fatigue.   Dr. Lemmon then performed follow-up testing in May of 2013.

In her initial report, dated July 10, 2011, Dr. Lemmon summarized her findings, and opined that Plaintiff "is experiencing cognitive dysfunction that is consistent with concussive injury" or mild traumatic brain injury ("MTBI"), and "[t]he fact that [Plaintiff] was not experiencing problems in executive functioning in her busy work life prior to the motor vehicle accident, suggests that it is the accident that has led to the impairments she now experiences in her everyday life and on this evaluation."  [Def. Ex. A pg. 8]  In a report following re-evaluation, dated June 16, 2013,  Dr. Lemmon noted that the neuropsychological testing revealed improvement.  However, "[s]ince it has been approximately four years since [her] accident, her impairments can be considered permanent."  As such, she opined that "it is most probable that areas of high level information processing will

2

continued to be impaired" including "working memory, visual processing, speed, and logical analysis." [Def. Ex. B pg. 13-14]

Then, in a letter to Plaintiff's counsel dated September 21, 2013, Dr. Lemmon addressed a record review by Dr. Gregory Reichhardt which indicated that "[g]iven [Plaintiff's] negative initial evaluation in the emergency room, it is unlikely that she sustained a concussion in relation to the accident. If she were to have sustained a concussion, which was mild enough to have not been noted. . . , it is unlikely that she could have any permanent ongoing problems . . . [and i]t is unlikely that she has any ongoing cognitive symptoms related to a brain injury associated with the accident." [Def. Ex. C pg. 1] Dr. Lemmon, in response, indicated that Plaintiff's injury is consistent with the American Congress of Rehabilitation Medicine criteria for an MTBI and cited to various studies that conclude that the diagnosis of MTBI was frequently absent from emergency room records. She also cites to research that supported the evolving nature of MTBI and how symptoms worsen and appear later as "[b]rain changes that occur as a result of a concussion are a process, not an event, and may set into motion many different pathological processes." She notes studies that describe the long term effects of MTBI, and that "The Centers for Disease Control and Prevention estimates that as many as 30 percent of people suffer permanent impairment from concussions." Dr. Lemmon concludes that "[i]f we look at [Plaintiff's] history, the mechanism of the injury, and the course of her recovery, we can come to no other conclusion but that she suffered a concussive injury and continues to experience persistent post-concussive syndrome." [Def. Ex. C pg. 6]

In this motion Auto-Owners argues that Dr. Lemmon should not be permitted to express opinions that: 1) Plaintiff sustained an MTBI in the accident; 2) Plaintiff's allegedly impaired performances on the neuropsychological testing or other testing resulted from a MTBI she sustained in the accident; and 3) Plaintiff's constellation of cognitive and psychological symptoms from the

date of the accident onward were caused by the accident.  Rather, her expert testimony should be

limited to reporting what the testing she performed revealed, in terms of the performances

themselves, not what caused those impaired performances.

## II.  RULE 702 MOTION

Auto-Owners challenges Dr. Lemmon's opinion that Plaintiff experienced MTBI (or a

concussive injury) as a result of the accident on the basis that she has not employed a reliable

scientific methodology to reach this opinion as to causation under Fed.R.Evid. 702.

"If scientific, technical or other specialized knowledge will assist the trier of fact to

understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training or education, may testify thereto in the form of an opinion

or otherwise."  Fed. R. Evid. 702.  Rule 702 imposes three requirements for the admission of

expert testimony.  First, the expert must be qualified by specialized knowledge, skill, experience,

training or education to testify on the subject matter of his or her testimony.  Second, the

testimony must be based upon sufficient facts or data, the product of reliable principles and

methods, and the product of the reliable application of these principles and methods to the facts

of the case.  Finally, the proffered expert testimony must be relevant to an issue in the case and

thereby assist the jury in its deliberations. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  This court performs an important

gatekeeping function to assure that each of these prerequisites is satisfied.  *Id.* (charging trial

courts with the responsibility of acting as gatekeepers to ensure that expert testimony is both

reliable and relevant); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49, 119 S.Ct. 1167,

143 L.Ed.2d 238 (1999)(clarifying that the court's gatekeeper function applies to all expert

testimony, not just testimony based in science).

The proponent of expert testimony has the burden of establishing the admissibility of the expert's opinions under Rule 702 by a preponderance of the evidence. *In re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1222 (D. Colo. 1998). The decision to admit or exclude expert testimony is reviewed for abuse of discretion. *Truck Insurance Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004)(noting that the "trial court is afforded substantial deference in its application of *Daubert* [*v. Merrell Dow, supra*]" and "we will only disturb the trial court's decision if we have a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances")(citations omitted).

Auto-Owners does not challenge Dr. Lemmon's expert qualifications or the relevancy of her opinions. Rather, it seeks exclusion of her opinions as to the cause of Plaintiff's alleged neurological symptoms as not reliable. The applicable factors to the reliability assessment, set forth in *Daubert v. Merrell Dow, supra*, include: (1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques, and (4) whether the theory or approach has "general acceptance." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004)(discussing the four-factor test for determining whether an expert's methodology is "scientifically sound"). This list is neither definitive nor exhaustive. *Id.* (citing *Kumho Tire Co. v. Carmichael, supra*, 526 U.S. at 150).

### III. DR. LEMMON'S OPINIONS

In her initial report, Dr. Lemmon outlined the neuropsychological testing she provided to Plaintiff two years after the accident.  Her report, dated July 10, 2011, indicates testing in the areas of intellectual functioning, memory and new learning abilities, attentional functioning and information processing, verbal fluency, conceptual abilities and executive functioning, motor abilities, and emotional functioning.  In the "Summary and Recommendations" section, Dr. Lemmon indicated that Plaintiff was experiencing "cognitive dysfunction that is consistent with concussive injury" or MTBI.  In addition, since the accident "she has experienced a significant increase in anxiety and some degree of increase in depression."  Dr. Lemmon concluded that "[t]he fact that [Plaintiff] was not experiencing problems in executive functioning in her busy work life prior to the motor vehicle accident suggests that it is the accident that has led to the impairments she now experiences in her everyday life and on this evaluation." [Def. Ex. A pg. 8]

After re-evaluation, Dr. Lemmon's follow-up report, dated June 16, 2013, summarized her past medical records and her new test results.  The results showed improvement, but also revealed ongoing impaired performances in divided attention, working memory, fine motor coordination for dominant and non-dominant hands, sequencing and abstract thinking.  Because it was almost four years after the accident, Dr. Lemmon indicated that Plaintiff's "impairments can be considered permanent" as "[r]esearch informs us that people with concussive injuries or mild traumatic brain injuries reach maximum medical improvement in the range of 18 to 24 months following the injury." [Def. Ex. B pg. 13]

Finally, on September 21, 2013, Dr. Lemmon wrote a letter to Plaintiff's counsel responding to a record review performed by Dr. Gregory Reichhardt.  In it she addressed Dr.

6

Reichhardt's opinion that:

> Given her negative initial evaluation in the emergency room, it is unlikely that she sustained a concussion in relation to the 07/01/09 accident.  If she were to have sustained a concussion, which was mild enough to have not been noted . . . , it is unlikely that she would have any permanent ongoing problems associated with this.  It is unlikely that she has any ongoing cognitive symptoms related to a brain injury associated with the 07/01/09 accident.

Dr. Lemmon cites to various research sources indicating that MTBI symptoms are often missed in emergency rooms, and that symptoms sometimes appear later.  In addition, she argues that "it is well established in the literature on [MTBI] that standard MRIs and CT scans do not pick up the microscopic damage caused by concussive injury."  Finally, she opines that "[i]f we look at [Plaintiff's] history, the mechanism of the injury, and the course of her recovery, we can come to no other conclusion but that she suffered a concussive injury and continues to experience persistent post-concussive syndrome." [Def Ex. B pg. 13]

## IV.  EVIDENTIARY HEARING

At the hearing on this motion, Dr. Lemmon testified that she is a neuropsychologist and, as such, she studies how disease of the brain effects cognitive functioning and/or behavior.  She testified that in June of 2011, Plaintiff was referred to her by her primary care physician to assess Plaintiff's neuro-cognitive status.  At that time she interviewed Plaintiff and obtained her medical history and medical record.  She then performed a battery of standardized, commonly accepted tests in order to assess Plaintiff's cognitive functioning. The test results – as set forth in her report – revealed a constellation of cognitive impairments in various areas (such as abstract thinking, concept formation, working memory, etc.).  For the purposes of this motion, Auto-Owners agrees that her testing revealed such impairments.

Dr. Lemmon then testified that it was her opinion that the Plaintiff suffered a MTBI during the July 2009 car accident at issue here.  While she agreed that there was no objective signs of an MTBI specifically documented in the medical records at the time of the accident, she noted that the literature supports an inference that a loss of consciousness is often missed by first responders.  She also testified that patients often don't recognize cognitive issues until some time after the initial trauma.  She noted that Plaintiff reported having a headache on the top of her head at the time of the accident, and reported cognitive difficulties (such as getting lost and being unable to understand documents at work) a few days later.  Dr. Lemmon further testified that only 5-10% of MTBI are identified on an MRI and that a Glascow Coma Scale of 15/15 (within 30 minutes of the accident) is within the range of mental functioning for an MTBI diagnosis. Dr. Lemmon further noted that MTBI is an "evolving diagnosis." Finally, Dr. Lemmon testified that it was her opinion that the constellation of cognitive impairments Plaintiff is still experiencing are permanent (she has reached Maximum Medical Improvement).

On cross examination, Dr. Lemmon was asked how she determined whether the type of accident at issue here could have caused an MTBI.  Dr. Lemmon indicated that she looked at the speed and damage to the cars (as initially reported to her by Plaintiff and then, later, in the accident report) and Plaintiff's cognitive difficulties incurred thereafter.  She indicated that thirty years of literature shows that there is no one threshold of the severity of impact required to cause an MTBI; rather, there are too many variables, each person is different, and it needs to be assessed on a case-by-case basis.  She also testified that she is not a biomedical engineer and it is not her job to analyze the forces incurred on the body by a car accident.

With regard to her opinion that Plaintiff incurred an MTBI during the accident at issue in

this case, Plaintiff was asked whether Plaintiff met the criteria used to diagnose an MTBI as set forth by the American Congress of Rehabilitation Medicine. [Def. Ex. Q pg. 183]  Dr. Lemmon responded that when she diagnosed Plaintiff with an MTBI, she did not set out the criteria in her report but that she did consider them.  She conceded that the medical records at the time of the accident contain no positive evidence (in the form of documented signs or symptoms) of MTBI.

Dr. Lemmon was then asked what alternative explanations she considered when making her MTBI diagnosis.  She testified that she considered the temporal nature of the symptoms, in that Plaintiff started experiencing new symptomology after the accident.  She then indicated that she ruled out that Plaintiff's cognitive symptoms were caused by her prior depression and anxiety based on her review of literature and her training and background.  Dr. Lemmon also ruled out Plaintiff's prior medical conditions (i.e. her hypothyroidism) as she did not have the symptoms before the accident.  She also testified that she did consider and ruled out:  Plaintiff's prior history of medication use; her alcohol use both prior to and after the accident; and her chronic pain.  In addition, she testified that she ruled out prior head injuries and her history of falls, emotional issues, and stress from litigation.  Dr. Lemmon indicated that her thought process – for ruling out alternative causes in her differential diagnosis – was sometimes not documented in her reports.

Dr. Hal S. Wortzel then testified as a defense expert in the field of forensic neuropsychiatry.  He testified that he is board certified in psychiatry, forensic psychiatry, neuropsychiatry and behavioral neurology.   In his report on this case, dated January 19, 2015, Dr. Wortzel rejected the position that "an uncomplicated mild TBI sustained in the motor vehicle accident of July 1, 2009 has resulted in substantial and persisting neuropsychiatric impairment."

[Def. Ex. F pg. 31] In so doing, Dr. Wortzel first noted that there is "no objective evidence to establish the occurrence of any TBI" at the time of the accident under the American Congress of Rehabilitation Medicine criteria.  Although he acknowledged a "brief alteration in consciousness, such as feeling momentarily dazed, stunned or confused" as reported by Plaintiff, "the records make it readily apparent that she was in the midst of a rather prominent emotional reaction, if not full panic attack, in the moments following the collision" and that such "anxiety reaction would be sufficient to explain any self-reported alteration in consciousness she experienced."  As such, Dr. Wortzel indicated that "the most appropriate diagnostic formulation regarding TBI and the accident at issue is a possible, albeit unlikely, mild TBI."

However, he further opined that any such MTBI "would represent the sort of injury from which a full and fast recovery is the norm" and that "even if an uncomplicated mild TBI did occur, it would still represent an extraordinarily poor explanation for the rather dramatic degree of neuropsychiatric impairment being claimed in the present litigation."  Instead, Dr. Wortzel concluded that "[t]he combination of chronic depression, anxiety, pain, poor sleep, medication effects, substance abuse, litigation effects and/or iatrogenic injury represents a far more medically probable explanation for [her] remarkable course of illness than an uncomplicated mild TBI." [Def. Ex. F pg. 40]

At the hearing, Dr. Wortzel opined that Dr. Lemmon did not apply a valid scientific methodology when diagnosing Plaintiff with an MTBI that, in turn, has caused long-term cognitive impairments.  He first testified that in order to diagnosis MTBI, you must have one of four symptoms – as identified by the American Congress of Rehabilitation Medicine – present at the time of the accident.  In this case, there is no documentation of the four diagnostic criteria

and, moreover, there was no documentation of other consistent symptoms such as nausea, vomiting, or dizziness, as well as no other injury that would distract from identifying concussion symptoms.  In addition, Dr. Wortzel testified that Dr. Lemmon's opinion that the criteria could present later – after the time of the accident – is inaccurate.  Second, Dr. Wortzel testified that Dr. Lemmon's methodology in her differential diagnosis of MTBI was also not scientifically valid.  Where the symptomology is "highly nonspecific," as here, Dr. Wortzel indicated that a clinician must look at other psycho-social circumstances.  In this case, there is evidence of depression, anxiety, OCD symptoms, bi-polar type II, long-term benzodiazepine use, alcohol use, litigation effects, malingering, and chronic pain.  Dr. Wortzel argues that in order to reach a diagnosis of MTBI using a differential approach, Dr. Lemmon should have determined the medical likelihood/ probability of such other causes.  It is his opinion that Dr. Lemmon's discounting or "marginalizing" the other possibilities constitutes a "fundamental flaw" in her scientific methodology.  Dr. Wortzel then testified that it is his opinion that other factors (most notably Plaintiff's long term use of benzodiazepines) are more likely to have caused her symptoms.  He testified that most people with MTBI injuries will have a full and quick recovery.  And, of the 10% that continue to show symptoms, it is his opinion that there are usually better explanations for the continued effects other than an MTBI.

On cross examination Dr. Wortzel agreed – although he thought that it was unlikely – that Plaintiff could have had a concussion (incurred a MTBI) at the time of the accident, although he reiterated that no such evidence was documented in the records.  He also conceded that the number of people who experience long-term symptoms from MTBI is debatable, and that the literature (including his own unpublished article) indicates that the number is as high as

11

20%.  He further indicated that if Dr. Lemmon employed a valid differential methodology, she did not document it in her reports.

Auto-Owners also proffered opinion evidence from Dr. Stephen Kalat, who is a clinical neuropsychologist.  In his report on this case, dated November 24, 2014, Dr. Kalat opined that "there is insufficient evidence to conclude that [Plaintiff] sustained a concussion in the 07-01-2009 MVA" and instead, it was Dr. Kalat's conclusion that she "had a stress reaction that exacerbated her pre-existing depression and anxiety."  Furthermore, he opined that "[i]n any case, a mild TBI . . .  would typically not result in permanent cognitive and emotion deficits."  Rather,  his opinion in his report is that "the overfocus on a 'brain injury' from a purported very mild concussion without loss of consciousness, without post-traumatic amnesia or even any observable alteration of consciousness has been detrimental to [Plaintiff] getting appropriate treatment for her anxiety and depression."  [Def. Ex. G. pg. 24, 28-29, 31-32]

At the hearing, Dr. Kalat testified that after analyzing the data – including Plaintiff's medical records, the accident report, and deposition testimony, as well as his interview and testing of Plaintiff in October 2014 – he concluded that the criteria for an MTBI diagnosis was not present at the time of the accident; rather, it was his opinion that Plaintiff had an acute stress reaction to the accident.  Furthermore, he testified that it was his opinion that an MTBI does not usually result in permanent or long-term cognitive or emotional impairments.  He noted that although a small number of people will still report some symptoms after a year of incurring an MTBI, other causes are most likely causing the symptoms.

Dr. Kalat then testified that Dr. Lemmon did not apply a valid scientific methodology when diagnosing Plaintiff with an MTBI.  He indicated that she didn't apply the American

Congress of  Rehabilitation Medicine criteria to her status at the time of the accident, which is

contrary to current standards for neuropsychology.  He specifically testified that when the

criteria are not present at the time of the accident, it is unlikely that an MTBI occurred even

when the criteria present a day later.  As such, Dr. Kalat opines that Dr. Lemmon's conclusion

that Plaintiff incurred an MTBI at the time of the accident is flawed and not reliable.

Furthermore, Dr. Kalat opined that Dr. Lemmon's differential analysis used to diagnose an

MTBI was also unreliable.  Specifically, he takes issue with Dr. Lemmon's failure to rule out

Plaintiff's alcohol use (both before and after the accident) and her chronic use of

benzodiazepines prior to the accident – both of which have longer effects on cognitive

impairment than the effects of an MTBI. Dr. Kalat also testified that two studies have concluded

that depression could cause the slowing of brain reactions and neuropsychological performance.

On cross-examination, Dr. Kalat was asked about the diagnostic criteria set forth in other

definitions of MTBI – including the Conceptual Definition of MTBI by The Centers for Disease

Control ("CDC") and the World Health Organization ("WHO") Operational Definition of MTBI.

He discounted those definitions as either not applicable here, or as not followed by the field.  He

conceded that the lack of objective findings in the CT Scan at the time of the accident, as well as

her assessed Glascow Coma score of 15, does not rule out an MTBI.  Rather, it was Dr. Kalat's

opinion that an MTBI would not typically result in permanent impairment or cognitive and

emotional defects.  Although a small number of people will still report some symptoms after a

year of incurring an MTBI, they are outliers and, as such, the proper clinical response would be

to look at other causes for the symptoms.  He testified that although earlier studies (in 1995 and

1999) indicate that the number of people who suffer long-term symptoms from an MTBI is in the

range of 10 to 20%, it is his opinion that those studies have been discredited and that better prospective studies show no significant number of symptoms after a year.  And, of the 5% that do, a clinician must look at possible other causes.

Dr. Kalat also indicated on cross-examination that his opinion was not based on the particular circumstances of the motor vehicle accident here, and that he was not aware of any threshold impact of speed necessary to result in a concussive injury.  He also testified that he is not a biomedical engineer.

## V.  ANALYSIS

In this motion Auto-Owners argues that Dr. Lemmon's opinion that the accident *caused* Plaintiff to incur a MTBI/concussive injury that, in turn, resulted in long-term cognitive impairments is unreliable and, as such, inadmissible.

Dr. Lemmon's methodology tracks the step-by-step process that the Tenth Circuit has previously found to be a reliable means of determining injury causation.  *Etherton v. Owners Ins. Co.*, 35 F. Supp. 3d 1360, 1367 (D. Colo. 2014), *appeal docketed*, No. 14-1164 (10th Cir. April 29, 2014).  The first step in that process is to determine general causation, meaning whether or not the type of injury that the plaintiff sustained could have been caused by the type of collision at issue.  The second step is to consider whether there was a temporal relationship between the plaintiff's injury and the collision.  Finally, the third step is to perform a differential diagnosis, in which the expert assesses specific causation by examining the plaintiff's physical symptoms, medical records, reported medical history, and the applicable medical literature to identify and rule out alternative causes of the plaintiff's injury via a differential analysis.  *Id.*

## A. General Causation

Auto-Owners first argues that Dr. Lemmon's assessment of general causation is scientifically invalid and unreliable.  Specifically, it contends that Dr. Lemmon's lack of knowledge of the accident cannot lead to a valid comparison with other similar accidents.  In addition, her statement that "neurological literature" shows that people can suffer MTBI as a result of a car accident with impact as low as 5 MPH is not supportable.  Auto-Owners also contends that her comparison of the medical record and the accident report in connection with her own personal and professional experience does not constitute valid scientific methodology.

Injury causation requires a showing of general causation which addresses whether an event is capable of causing a particular injury or condition in the general population.  *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005).   In other words, general causation refers to whether the accident in question is, in the abstract, capable of producing the type of injury suffered.  *Neiberger v. Fed Ex Ground Package System, Inc.*, 566 F.3d 1184, 1190-91 (10th Cir. 2009).  General causation may be established by, for example, epidemiological evidence, but an expert is not required to cite published studies in order to reliably conclude that a particular object caused a particular illness.  *Etherton v. Owners, supra,* 35 F.Supp.3d at 1366 (*citing Neiberger v. Fed Ex Ground, supra,* 566 F.3d at 1190-91; *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1211 (10th Cir. 2002); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000)).

Dr. Lemmon testified in her deposition that accidents like this one – essentially a rear-end collision – can cause MTBI/concussive injuries. [Def. Ex. D. pp 33-40]  She testified that this conclusion is based on her years of experience as a neuropsychologist who sees people that

15

have been in these kinds of accidents. [Def Ex. D pg 35-36]  She also relied on thirty years of neurological literature which shows that people can suffer such injuries and permanent disability as a result of accidents – she cited to an author ("Packard") who concluded that permanent disability can occur in such accidents of five MPH impact. [Def. Ex. pp. 37-40]  She further testified at her deposition that whether a person suffers a MTBI in a car accident depends on the individual and there is no specific threshold of impact necessary to cause an MTBI. [Def Ex. D pp. 48-52]  At the hearing on this matter, Dr. Lemmon reiterated that the type of accident at issue here could have caused an MTBI based on the speed and damage to the cars, Plaintiff's cognitive difficulties thereafter, and her experience as a clinical neuropsychologist seeing other MTBI patients. She also testified that the literature shows that there is no one threshold of the severity of impact required to cause an MTBI as it needs to be assessed on a case-by-case basis.

At the hearing, Auto-Owners sought to have Charles E. Bain testify in favor of the defense in the field of Forensic Biomechanics.  In his report, dated August 1, 2014, Dr. Bain analyzed the available data related to this accident and the resulting impact to the vehicles and to Plaintiff in the form of head acceleration.  Dr. Bain opined, based on the circumstances here, that "[a]lthough there is no threshold at which injury occurs in all people . . . [Plaintiff's] risk of an MTBI was essentially zero." [Def. Ex. E pg. 9]  Dr. Bain's report concluded, in relevant part, that "[i]n summary [Plaintiff] was involved in a low acceleration rear-end motor vehicle collision that subjected her to minimal accelerations and forces.  Biomedically, her risk of an mTBI was essentially zero."  [Def. Ex. E. pg. 12]  At the hearing, Dr. Bain agreed that he would testify to the same.  I ruled, however, that Dr. Bain's testimony would not be helpful or relevant to the issue at hand – whether  Dr. Lemmon's opinions as to causation were scientifically valid.  Dr.

16

Lemmon specifically testified that she is not a biomedical engineer and it is not her job to analyze the forces incurred on the body by a car accident.

Rather, the issue in this motion is whether Dr. Lemmon's methodology – i.e. her application of thirty years of clinical experience with patients involved in car accidents and the medical literature which concludes that there is no threshold of impact for injury but that such assessment must be made on a case-by-case basis – was sufficiently scientifically reliable to conclude that this accident could have caused the driver to suffer an MTBI.  I conclude that Dr. Lemmon's testimony as to general causation is sufficiently reliable.  Dr. Kalat agreed that a neuropsychologist is not an accident reconstructionist or biomedical engineer, and he was not aware of any threshold impact of speed necessary to result in a concussive injury.  While Dr. Bain may disagree with the premise that there is no threshold accident speed for a resulting MTBI, that issue is for cross examination.  *See Etherton v. Owners Ins., supra,* 35 F. Supp. 3d at 1373(ruling that "[s]o long as the Rule 702 standards are met, an expert may testify at trial, where he or she will be subject to cross-examination and where the other party may offer the rebuttal testimony of its own experts"); *see also* Charles Alan Wright et al., 29 Fed. Prac. & Proc. Evid. §6262 (1st ed. 2013)(noting that "where expert testimony has the scientific earmarks of reliability, the judicial inquiry is over. The courts are not to decide if the expert's opinions are, in fact, scientifically or technically correct. The evidence is then admitted and subjected to the kind of adversarial attack that facilitates the jury's central functions of deciding what weight to attribute to evidence and what witnesses to believe").

**B.  Temporal Relationship:**

Auto-Owners also claims Dr. Lemmon's opinion as to causation is scientifically invalid because it is based solely on the basis that Plaintiff's subjective complaints began after the accident.  Specifically, Auto-Owners argues that Dr. Lemmon's opinion on specific causation is improperly based on a temporal relationship (*post hoc, ergo propeter hoc* – after this, therefore because of this) between the timing of the accident and subjective patient reports.  Plaintiff argues, in response, that Dr. Lemmon's opinion as to causation is not based solely on Plaintiff's subjective reports, but rather was based on her review of the medical records (including her own extensive history; the accident report; Plaintiff's primary care physician records – and his diagnosis the day after the accident of a concussion resulting in mild memory impairment; Plaintiff's treating chiropractor records – indicating a concussion with cognitive dysfunction; and emergency room records).  In addition, she relies upon her own experience practicing neuropsychology for more than thirty years and the fact that she is a treating physician.  *See generally Huntoon v. TCI Cablevision of Colorado, Inc*., 969 P.2d 681, 689 (Colo. 1998)(ruling that neuropsychologists are not *per se* unqualified to speak on the causation of organic brain injury); *Blotcher v. Stewart*, 45 F. Supp. 3d 1274, 1283 (D. Colo. 2014)(noting that "[w]hether a neuropsychologist may opine on the physical cause of an organic brain injury depends on the plaintiff's ability to provide a proper foundation for such testimony").

It is clear that a temporal connection may be considered as "one factor in assessing causation so long as it is not the sole factor relied upon."  *Etherton v. Owners Ins. supra*, 35 Fed.Supp.3d at 1369-70 (*citing Goebel v. Denver and Rio Grande Western R. Co.*, 346 F.3d 987, 999 (10th Cir. 2003)).  While Dr. Lemmon clearly relies upon the fact that Plaintiff reports

18

having no symptoms before the accident, she testified that it was not the only basis for her opinion as to causation. As such, Auto-Owner's assertion that Dr. Lemmon's opinion is unreliable because it is based on solely on a temporal relationship between the accident and subjective patient reports, is without merit. *Etherton v. Owners, supra,* 35 F.Supp.3d at 1370 (ruling that "[a]lthough defendant is correct that temporal proximity, standing alone, is not sufficient to establish causation, [the expert] did not rely exclusively on this factor and instead permissibly considered it as part of a broader analysis, incorporating physical examination of plaintiff and review of plaintiff's medical records").

**C. Specific Causation:**

Finally, Auto-Owners argues that Dr. Lemmon's opinion that the specific accident in this case caused Plaintiff to incur an MTBI (that, in turn, caused permanent cognitive impairments) is unreliable. Auto-Owners claims her opinion as to specific causation is scientifically invalid because Dr. Lemmon failed to adequately rule out alternative causes when making her differential diagnosis.

Specific causation is whether an event caused a particular individual's injury. *Norris v. Baxter Healthcare, supra,* 397 F.3d at 881. Once a party has established general causation, differential diagnosis may be admissible to prove specific causation. *Etherton v. Owners Ins., supra,* 35 F. Supp.3d at 1366. Differential analysis, which is the process of reasoning to the best inference, requires that the expert provide objective reasons for eliminating alternative causes. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1237 (10th Cir. 2004). "In the medical context, differential diagnosis is a common method of analysis, and federal courts have regularly found it reliable under *Daubert* [*v. Merrill Dow*]." *Etherton v. Owners Ins., supra,* 35 F. Supp.3d at 1371

(*citing Bitler v. A.O. Smith, supra*, 400 F.3d at 1237 (collecting cases)).

An expert cannot show mere possibility, but instead "an inference to the best explanation for the cause of an accident must eliminate other possible sources as highly improbable, and must demonstrate that the cause identified is highly probable." *Bitler v. A.O. Smith, supra,* 400 F.3d at 1238. However, "[i]n order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury; [t]he fact that several possible causes might remain uneliminated only goes to the accuracy of the conclusion, not to the soundness of the methodology." *Etherton v. Owners Ins., supra,* 35 F. Supp. 3d at 1371 (*citing Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000)).

As an initial matter, I note that to the extent Auto-Owners argued at the evidentiary hearing that Dr. Lemmon's differential diagnosis is not reliable because she failed to apply the criteria used to diagnose an MTBI as set forth by the American Congress of Rehabilitation Medicine, I disagree. First, Dr. Lemmon testified at the hearing that while there were no objective signs documented in the medical records at the time of the accident, she discounted this based on the fact that a loss of consciousness is often missed by first responders, and noted that Plaintiff reported symptomology during the time of the accident (a headache on top of her head) and in the days thereafter (getting lost and being unable to understand documents at work). While Dr. Wortzel disagreed, he did concede "a possible, albeit unlikely, mild TBI," although he reiterated that no such evidence was documented in the records and that he disagreed with Dr. Lemmon's conclusion that the diagnostic criteria could present at a later time. Likewise, Dr. Kalat specifically testified that when the criteria are not present at the time of the accident, it is unlikely that an MTBI occurred even when the criteria present a day later. However, both

defense experts noted that the American Congress of Rehabilitation Medicine criteria only serves to rule-in a MTBI diagnosis.  While the defense experts testified that Dr. Lemmon's MTBI conclusion in assessing or applying the criteria was suspect, I do not find that her scientific methodology was invalid.

Auto-Owners also asserts that Dr. Lemmon failed to rule out other objective causes for Plaintiff's post-accident cognitive complaints, as required for differential analysis, such as her: pre-existing history of significant depression and anxiety from an early age; use of medications, both before and after the accident; alcohol use (including her reported "self-medication" with alcohol after the accident); prior accidents and reported concussions; history of falls; ongoing physical pain complaints, before and after the accident; and the effect of litigation.  These alternative factors were identified by Auto-Owners' experts – Dr. Wortzel and Dr. Kalat.  Auto-Owners contends that Dr. Lemmon's failure to address these possible alternative causes constitutes an unreliable application of scientific methodology.

In response, Plaintiff contends that  Dr. Lemmon did, in fact, address possible alternative causes.  She considered Plaintiff's preexisting depression and anxiety, but concluded that they were well-controlled before the accident and, moreover, such conclusion necessarily included a consideration of her pre-existing medications.  Dr. Lemmon also considered prior head injuries and falls, but indicated there was no evidence of resulting concussions or dysfunction.  Dr. Lemmon was aware of Plaintiff's physical pain (caused by the accident) as well as the stress effects related to this litigation.  Finally, Dr. Lemmon rejected the conclusion that Plaintiff's lack of consciousness at the time of the accident precluded a diagnosis of concussive injury.  At the hearing, Dr. Lemmon conceded that her thought process – for ruling out alternative explanations

in her differential diagnosis – was sometimes documented in her reports and sometimes not. However, she specifically testified that she ruled out that Plaintiff's symptoms were caused by: her prior depression and anxiety, based on her review of literature and her training and background; her prior medical conditions (i.e. her hypothyroidism) as she did not have the symptoms before the accident; Plaintiff's prior history of medication use; her alcohol use both prior to and after the accident; her chronic pain; her prior head injuries; her history of falls and emotional issues; and the litigation effects.

Although Dr. Lemmon's scientific rigor in ruling out these alternative causes was called into question by the defense experts, Dr. Lemmon utilized reliable methodology when making a differential diagnosis by considering and eliminating possible alternative causes of her injury. *See Etherton v. Owners Ins., supra*, 35 F. Supp. 3d at 1366-67 (ruling that a differential diagnosis "refers to the process by which a physician rules in all scientifically plausible causes of the plaintiff's injury . . . then rules out the least plausible causes of injury until the most likely cause remains")(*quoting Hollander v. Sandoz Pharm., supra,* 289 F.3d at 1209).

**D. Conclusion:**

While her opinions as to causation in this case are subject to question and, as such, the crucible of cross-examination, I find and conclude that Dr. Lemmon's scientific methodology used to come to those opinions are sufficiently reliable in order to withstand my gatekeeping role under Rule 702 and *Daubert v.v. Merrell Dow*.  In reviewing the reliability of Dr. Lemmon's proffered expert testimony, a court is to focus on her methodologies, and not on the conclusions generated.  *Daubert v. Merrell Dow*, *supra*, 509 U.S. at 595.  In this case, Dr. Lemmon utilized a theory that is widely used and any flaw in her opinion go to the weight of the evidence and the

conflicting expert testimony, rather than to its admissibility. *Etherton v. Owners Ins., supra,* 35 F. Supp.3d at 1367 (*citing Norris v. Baxter Healthcare, supra,* 397 F.3d. 878). Therefore, I deny Auto-Owners motion seeking to exclude Dr. Lemmon's expert testimony under Rule 702.

## VI.  MOTION UNDER RULE 403

Based on the name of this motion – Motion to Exclude Certain Opinion Testimony of Janet N. Lemmon, Ph.D, Pursuant to Fed. R. Evid. 702 and Fed. R. Evid. 403 – it appears that Auto-Owners seeks to exclude Dr. Lemmon's expert testimony on the alternative basis that "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Auto-Owners' brief, however, does not address this argument beyond citation to Rule 403 on page 3 of its motion. [Docs #52 & #66]  At the evidentiary hearing, Plaintiff's counsel confirmed that the sole basis for exclusion was a challenge under Rule 702.

## VII.  PENDING MOTION

Finally, at the end of the evidentiary hearing on this matter I ruled that I would be taking Auto-Owners' remaining motion to exclude – entitled Motion to Exclude Certain Testimony of Mary Ann Keatley, Ph.D, and Dr. Rebecca Hutchins Pursuant to F.R.E 702 and F.R.E. 403 [Doc #62] – under advisement.  I further ruled that I would allow simultaneous supplemental briefing from the parties on this motion, if they wish, within two weeks following the date of this ruling.

ACCORDINGLY, for the reasons indicated, I DENY the Motion to Exclude Certain Opinion Testimony of Janet N. Lemmon, Ph.D, Pursuant to Fed. R. Evid. 702 and Fed. R. Evid. 403 filed by Auto-Owners. [**Doc #52**]  In addition, I FURTHER ORDER that the parties may file supplemental briefs – of not more than 10 pages in length – on the pending Motion to Exclude Certain Testimony of Mary Ann Keatley, Ph.D, and Dr. Rebecca Hutchins Pursuant to F.R.E 702 and F.R.E. 403 [**Doc #62**] on or before November 6, 2015.

Dated:   October    21   , 2015 in Denver, Colorado.

BY THE COURT:

    s/Lewis T. Babcock
LEWIS T. BABCOCK,  JUDGE